# EXHIBIT A
# PART 1

ASSET PURCHASE AGREEMENT

BY AND AMONG

LOGIC PACKAGING ACQUISITION, LLC,
AS BUYER

AND

LOGIC PACKAGING, INC.,
AS SELLER,

AND

GEORDY WILLIAM DOUGLAS DAVIDSON,
AS PRINCIPAL,

This is the first page of the Asset Purchase Agreement (the "Agreement"). Pursuant to South Carolina law, this Agreement is subject to the following:

**THIS AGREEMENT IS SUBJECT TO MANDATORY BINDING ARBITRATION. THIS AGREEMENT TO ARBITRATE IS BINDING ON ALL PARTIES TO THIS AGREEMENT, ALONG WITH THEIR SUCCESSORS, HEIRS, ASSIGNS, AND TRANSFEREES.**

If other pages, including but not limited to, cover pages or tables of contents, are placed in front of this page, those pages shall not be deemed the first page. This page and only this page shall be deemed or considered the first page of this Agreement for all legal purposes.

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of September 5, 2012 (the "Effective Date"), is between Logic Packaging Acquisition, LLC, a South Carolina limited liability company (the "Buyer"), Logic Packaging, Inc., a South Carolina corporation (the "Seller"), and Geordy William Douglas Davidson, a South Carolina resident and sole stockholder of the Seller (the "Principal").

## W I T N E S S E T H:

WHEREAS, Seller is a corporation engaged in the business of offering and providing packaging supplies and services, including, without limitation, consultation and design services, returnable packaging sales, returnable packaging management and engineered systems sales (the "Business"); and

WHEREAS, Seller desires to sell, transfer and assign to the Buyer, and the Buyer desires to purchase and acquire from the Seller, certain assets of the Seller used in the Business, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties hereinafter set forth, the parties agree as follows:

## ARTICLE I.

## DEFINITIONS

In addition to the other terms defined in this Agreement, the following terms will have the definitions indicated:

"AAA" shall have the meaning set forth in Section 9.4 of this Agreement.

"Acquired Assets" shall have the meaning set forth in Section 2.1 of this Agreement.

"Actual Net Working Capital" shall mean the sum of (a) accounts receivable (including trade and other purchased receivables) included in the calculation of Estimated Net Working Capital that have been collected within one hundred (100) days following the Closing plus (b) Inventory, minus (x) all accounts payable as of the Closing and (y) customer deposits as of the Closing. Actual Net Working Capital does not include positive or negative cash balances, capital lease or bank indebtedness obligations.

"Agreement" shall mean this Asset Purchase Agreement, together with and including all of the Schedules and Exhibits referenced herein.

"Arbitrator Designation Period" shall have the meaning set forth in Section 9.4 of this Agreement.

"Assignment and Assumption Agreement" shall mean the assignment and assumption agreement between the Buyer and Seller in the form attached hereto as Exhibit A.

"Assignment of Lease Agreement" shall mean the assignment of lease agreement between the Buyer, Seller and Landlord in the form attached hereto as Exhibit C.

"Assumed Contracts" shall have the meaning set forth in Section 2.4(b) of this Agreement.

"Assumed Liabilities" shall have the meaning set forth in Section 2.4 of this Agreement.

"Bill of Sale" shall mean the bill of sale and assignment evidencing the transfer from the Seller to the Buyer of the Acquired Assets in the form attached hereto as Exhibit D.

"Business" shall have the meaning set forth in the recitals of this Agreement.

"Buyer" shall mean Logic Packaging Acquisition, LLC, a South Carolina limited liability company.

"Claim Notice" shall have the meaning set forth in Section 9.4 of this Agreement.

"Closing" shall mean the closing of the transactions contemplated by this Agreement, including without limitation the execution and delivery of all Transaction Documents by the parties on the Closing Date and the completion of wiring and verified receipt of the Closing Date Payment by Seller.

"Closing Date" shall mean September 5, 2012, or such other date as the parties may mutually agree upon.

"Closing Date Payment" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidential Information" shall have the meaning set forth in Section 11.4 of this Agreement.

"Contracts" shall mean any contract, obligation, understanding, commitment, lease, license, purchase order, bid or other agreement, whether written or oral and whether express or implied, together with all amendments and other modifications thereto.

"Copyrightable Works" are original works such as molds, models, sketches, paintings, drawings, themes, designs, computer and other graphics, digital creations, electronic creations, computer and other programs, sound recordings and dramatic, graphic, literary, musical, and pictorial works.

"Counternotice" shall have the meaning set forth in Section 9.4 of this Agreement.

"Effective Date" shall have the meaning assigned to it in the recitals of this Agreement.

3

"Employee Benefit Plans" shall mean all plans, programs, contracts, policies and practices providing benefits to any employee or former employee of the Seller, whether contractual or provided by law, including, without limitation, any "employee benefit plan" within the meaning of ERISA, any pension, thrift, savings, profit sharing, retirement bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute," severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting contracts, "golden parachute," collective bargaining agreements, employee manuals and written or binding oral statements of policies, practices or understandings related to employment.

"Encumbrance" means any lien (other than a Permitted Lien), mortgage, pledge, encumbrance, charge, security interest, adverse claim, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction or other restriction of any kind or nature.

"Equipment" shall mean all of the equipment listed on Schedule 4.9 attached hereto.

"ERISA" shall mean the Employee Retirement Income Security Act, as amended.

"Estimated Net Working Capital" shall mean the sum of (a) accounts receivable (including trade and other purchased receivables) that are less than sixty (60) days old from the date of invoice at Closing plus (b) Inventory, minus (x) all accounts payable as of the Closing and (y) customer deposits as of the Closing. Estimated Net Working Capital does not include positive or negative cash balances, capital lease or bank indebtedness obligations.

"Excluded Assets" shall mean those assets of the Business which are specifically identified on Schedule 2.2.

"Final Statement" shall have the meaning set forth in Section 3.3(b) of this Agreement.

"Financial Statements" shall mean the (i) unaudited balance sheets and related statements of income of the Business for the three (3) fiscal years ended December 31, 2009, December 31, 2010 and December 31, 2011, and (ii) internally prepared unaudited balance sheet and related statements of income of the Business for the interim period ended July 31, 2012, copies of which are attached as Schedule 4.5.

"Governmental Body" means any federal, state, provincial, local, foreign or other government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing.

"Guaranty" shall have the meaning set forth in Section 3.2(c) of this Agreement.

"Independent Accounting Firm" shall have the meaning set forth in Section 3.3(b)(ii) of this Agreement.

"Intangible Assets" shall mean all those items listed on Schedule 4.11, as defined in Section 4.11 of this Agreement.

4

"Inventions" are discoveries, concepts, ideas, formulas, processes, budgets, methods, projections, programs, digital creations, electronic creations, information and improvements belonging to the Seller that relate to the Business, whether or not patentable, and related know-how.

"Inventory" shall mean all of the inventories of the Seller listed on <u>Schedule 4.8</u> attached hereto.

"IPS" shall mean Industrial Packaging Supplies, Inc. of Greenville, a South Carolina corporation.

"IRS" means the United States Internal Revenue Service.

"Law" means any federal, state, provincial, local, foreign or other law, statute, ordinance, regulation, rule, regulatory or administrative guidance, order, constitution, treaty, principle of common law or other restriction of any Governmental Body.

"Letter of Intent" shall mean that certain letter of intent executed by Buyer and Seller dated July 3, 2012.

"Liability" shall mean any liability, obligation or commitment of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Lease" shall have the meaning set forth in Section 4.12(b) of this Agreement.

"Loss" or "Losses" shall have the meaning set forth in Section 9.3 of this Agreement.

"Material Agreements" shall mean the Contracts described and identified in Section 4.12(a), Section 4.12(b), Section 4.12(c), Section 4.12(d), and Section 4.12(e) of this Agreement.

"Note" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"Organizational Documents" means (i) any certificate or articles of incorporation, organization or formation and any bylaws, partnership agreement, or operating agreement, (ii) any documents comparable to those described in clause (i) as may be applicable pursuant to any Law and (iii) any amendment or modification to any of the foregoing.

"Payment Certificate" shall have the meaning set forth in Section 9.4 of this Agreement.

"Permitted Liens" shall mean liens accepted in writing by Buyer in Buyer's sole discretion as listed on <u>Schedule 4.7(b)</u>.

"Person" shall mean any natural person, firm, partnership, association, corporation, limited liability company, association, trust, public body or Governmental Body.

"Preliminary Statement" shall have the meaning set forth in Section 3.3(a) of this Agreement.

"Principal" shall mean Geordy William Douglas Davidson, a South Carolina resident and sole stockholder of the Seller.

"Purchase Price" shall have the meaning set forth in Section 3.1 of this Agreement, including any adjustments to the Purchase Price as provided herein.

"Record(s)" shall mean all the books and records of the Seller, including but not limited to Seller's customer records, book of business, client lists, customer list, customer records and related information, correspondence, memos, accounting records, books of account, computer tapes, hard disk drive data and all other books and records whether in physical, electronic or other media owned by the Seller.

"Related Agreements" shall mean the Assignment and Assumption Agreement, the Assignment of Intellectual Property Rights, the Assignment of Lease Agreement, the Bill of Sale, the Note, the Security Agreement and the Guaranty.

"Rules" shall have the meaning set forth in Section 9.4 of this Agreement.

"Security Agreement" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"Seller" shall mean Logic Packaging, Inc., a South Carolina corporation.

"Seller Interim Financial Documents Date" shall mean July 31, 2012.

"Seller Products" shall mean any and all products or services offered by the Seller, including, without limitation, the products and services offered by Seller with respect to the Business.

"Tax" shall mean any foreign, U.S. federal, state or local income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value-added, general service, alternative or add-on minimum, or estimated tax, including any interest or penalty thereon.

"Transaction Document(s)" shall mean this Agreement, the Related Agreements and each, any and all other written agreements, statements, documents, instruments, schedules, exhibits, opinions and certificates required or contemplated by any of the foregoing documents.

## ARTICLE II.

### PURCHASE OF AND SALE OF ASSETS

2.1    Acquired Assets.  Subject to and upon the terms and conditions set forth in this Agreement, and on the Closing Date and for the Purchase Price stated herein, Seller shall sell, convey, assign, transfer and deliver to the Buyer, free and clear of all Liabilities and Encumbrances, and the Buyer shall purchase and acquire from the Seller, full legal right, title and interest in and to all of the assets that are owned by the Seller or in which the Seller has any

right, title or interest (collectively, the "Acquired Assets"), except as expressly provided in Section 2.2 below. Without limiting the foregoing, the Acquired Assets, include, but are not limited to (i) the Equipment; (ii) the Inventory; (iii) Seller's accounts receivable, notes receivable, deposits and prepaid assets, wherever located; (iv) Seller's goodwill; (v) the Intangible Assets; (vi) the Records; and (vii) Seller's rights and benefits under the Assumed Contracts.

2.2     Excluded Assets.  Notwithstanding the foregoing, the assets of Seller listed on Schedule 2.2 are excluded from the definition of the Acquired Assets and shall be retained by the Seller after the Closing (collectively, the "Excluded Assets").

2.3     No Liabilities Assumed.  Except as expressly provided under Section 2.4, the Buyer shall assume no liabilities or obligations of the Seller, whether absolute, contingent, known or unknown, determinable or not determinable or otherwise, or whether relating to the Acquired Assets or the Business.  Without limiting the foregoing, such excluded liabilities include, without limitation, the following:

(a) any obligations of Seller under any trade account or note or accounts payable or any outstanding bank checks payable;

(b) any obligations of Seller under this Agreement arising from any breach of obligations hereunder or of any representation or warranty hereunder;

(c) any Liabilities or obligations of Seller arising by reason of any violation of federal, state or local law or any rule, regulation or other requirement of any governmental authority occurring before the Closing, including, without limitation, any environmental, health, safety or employment laws or regulations;

(d) any Liabilities for any income taxes imposed by reason of the sale or conveyance of the Acquired Assets to the Buyer, it being understood and agreed that the Buyer will not be deemed to be Seller's transferee with respect to any income tax liability;

(e) any Liability of Seller in respect of any amount of federal, state, local or foreign taxes (including, without limitation, ad valorem, franchise, payroll or sales and use taxes and any interest, penalties and additions to such taxes) imposed by virtue of the operations of the Business before the Closing, whether assessed before, at or after the Closing;

(f) any Liability or obligation of the Seller for breach of contract, breach of warranty, or similar claim arising from products or services sold by Seller before the Closing and any other claims by Business customers and vendors arising from circumstances existing before the Closing or any liability or obligation of Seller for products liability claims arising from products or services sold by Business before the Closing;

(g) any obligation or Liability of any kind under any employee benefit plan maintained currently or in the past by Seller, or under any employee benefit plan or

7

agreement which Seller has any present or future obligation or liability or under which any of its employees has any present or future rights;

(h) any Liability with respect to (i) accrued vacation and bonuses, (ii) severance, settlement or non-competition payments, (iii) sick leave, payroll or other compensation and taxes related thereto or (iv) insurance, continued insurance or COBRA benefits, bonus plans or any other Employee Benefit Plans or programs or policies and taxes related thereto arising in connection with the employment of any person by Seller, and any other liability or obligation to current, retired, deceased, disabled or former employees of Seller or its survivors or beneficiaries as of the Closing, provided, however, that in the event that Buyer elects to employ any employee of Seller after the Closing Date, Buyer shall be responsible for any post-termination COBRA benefits for said employee in the event that such employee is terminated by Buyer;

(i) any Liability of Seller in respect of injury to (whether personal or economic) or death of any Person or damage to or destruction of property occurring before the Closing;

(j) any Liability arising or accruing under any contract or agreement of the Seller (express or implied, orally or written) (other than as set forth in the Material Agreements as disclosed to and expressly assumed by Buyer);

(k) any Liability of Seller arising after the Closing; and

(l) any other Liability or obligation of Seller, arising prior to Closing, whether such liability was then or now or at any other time known or unknown by Seller.

2.4    Assumed Liabilities.  On the terms and subject to the conditions contained in this Agreement, and assuming that the representations and warranties made by Seller in this Agreement are true and complete in all material respects as of the date or dates given, Buyer shall assume and agree to discharge and perform Seller's Liabilities and obligations under the following items (collectively, the "Assumed Liabilities"):

(a)    the accounts payable listed on Schedule 2.4(a); and

(b)    the Contracts to be expressly assumed by Buyer at Closing pursuant to an Assignment and Assumption Agreement, which such Contracts are listed on Schedule 2.4(b) (the "Assumed Contracts"), but only to the extent that the Liabilities and obligations under such Assumed Contracts (x) relate to an obligation or Liability to be performed after the Closing and (y) do not arise out of or relate to any breach or violation of the terms of an Assumed Contract, or any tort committed under an Assumed Contract, occurring prior to the Closing.

## ARTICLE III.

### PURCHASE PRICE AND CLOSING

3.1    Purchase Price. Subject to the adjustments set forth in Section 3.3, the purchase price of the Acquired Assets shall be One Million One Hundred Fifty Thousand Dollars ($1,150,000.00) (the "Purchase Price"). Subject to any adjustments pursuant to Section 3.3 below, the Purchase Price shall be allocated in accordance with Schedule 3.1, and Buyer shall cause its accounting firm to prepare and deliver an IRS Form 8594 upon determination of the final adjustments of the Purchase Price pursuant to Section 3.3 below.

3.2    Payment of the Purchase Price. The Purchase Price shall be paid as follows:

(a) An amount equal to Eight Hundred Thousand Dollars ($800,000.00) in immediately available cash funds shall be paid to Seller at Closing via wire transfer to the account or accounts provided to Buyer by Seller (the "Closing Date Payment"); provided, however, that the Closing Date Payment shall be subject to adjustment as set forth in the Section 3.3 below;

(b) An amount equal to Three Hundred Fifty Thousand Dollars ($350,000.00) shall be evidenced by the promissory note attached hereto as Exhibit E (the "Note"). The Note shall be secured by the Security Agreement attached hereto as Exhibit F (the "Security Agreement"). The Note will be repaid in two installments of $175,000, the first such installment to be due on the first anniversary of the Closing Date and the second such installment to be due on the second anniversary of the Closing Date.

(c) The Note shall be jointly and severally guaranteed by Jerry W. Murdock and IPS pursuant to the Guaranty Agreement substantially in the form of Exhibit G attached hereto (the "Guaranty").

3.3    Adjustment to Purchase Price. The Purchase Price shall be adjusted as follows:

(a) With respect to the Seller's Estimated Net Working Capital as of the Closing, on or within three (3) business days prior to the Closing Date, Seller shall deliver to Buyer a detailed statement of the Estimated Net Working Capital (the "Preliminary Statement"). If the Estimated Net Working Capital is less than Two Hundred Fifteen Thousand One Hundred Thirty-Three and 84/100 Dollars ($215,133.84), then the Closing Date Payment shall be reduced by such difference, and, if such difference exceeds the amount of the Closing Date Payment, the remaining portion of such difference will be deducted first from first payment due under the Note and then, if necessary, from the second payment due under the Note. In the event that the Estimated Net Working Capital exceeds Two Hundred Fifteen Thousand One Hundred Thirty-Three and 84/100 Dollars ($215,133.84), then the Closing Date Payment shall be increased by such difference. If the Buyer disagrees with any items in the proposed Preliminary Statement, it may provide notice of such disagreement to the Seller. The parties shall negotiate in good faith to resolve any dispute and to reach an agreement prior to the Closing Date on such preliminary adjustments to the Closing Date Payment or the Note, as applicable, as of the

9

Closing Date. The adjustments shown in the Preliminary Statement, as adjusted by agreement of the parties, will be reflected as an adjustment to the Closing Date Payment or the Note, as applicable.

(b) With respect to the Seller's Actual Net Working Capital, within one hundred twenty (120) days following the Closing, Buyer shall deliver to the Seller a detailed statement of the Actual Net Working Capital (the "Final Statement"). If the Actual Net Working Capital is less than the Estimated Net Working Capital, then such difference shall be paid by Seller to Buyer no later than thirty (30) days from the date on which the Actual Net Working Capital is finally determined. If the Actual Net Working Capital exceeds the Estimated Net Working Capital, then such difference shall be paid by Buyer to Seller no later than thirty (30) days from the date on which the Actual Net Working Capital is finally determined.

(i) The Buyer shall provide the Seller with prompt reasonable access to all records to the extent reasonably requested by the Seller to evaluate the Final Statement. If the Seller concludes that the Final Statement does not accurately reflect the adjustments to be made to the Purchase Price in accordance with this Section 3.3 and desires to object thereto, the Seller shall, within thirty (30) days after its receipt of the Final Statement, provide to the Buyer a written statement of any discrepancies believed to exist. If the Seller does not provide such a written statement to the Buyer within thirty (30) days after its receipt of the Final Statement, then the Final Statement as delivered by the Buyer shall be conclusive on all parties to this Agreement and not subject to dispute or judicial review. The Buyer and the Seller shall use good faith efforts to jointly resolve any discrepancies within thirty (30) days of the Buyer's receipt of the Seller's written statement of discrepancies, which resolution, if achieved, shall be binding upon all parties to this Agreement and not subject to dispute or judicial review.

(ii) If Buyer and Seller cannot resolve the discrepancies to their mutual satisfaction within such thirty (30) day period, the Buyer and the Seller shall, within the following ten (10) days, jointly designate a national independent public accounting firm to be retained to review the Final Statement together with the Seller's discrepancy statement and any other relevant documents. The parties agree that the foregoing independent public accounting firm shall not be one that is, or within two (2) years prior to the Closing Date has been, engaged by the Buyer or the Seller (the "Independent Accounting Firm"). Such Independent Accounting Firm shall be instructed to promptly report its conclusions with respect to each specific adjustment which remains in dispute as to the appropriate amount of such adjustment pursuant to this Section 3.3, which shall be conclusive on all parties to this Agreement and not subject to dispute or judicial review. Such Independent Accounting Firm shall not be instructed to conduct any independent audit activity but may do so if it deems reasonably necessary. Such Independent Accounting Firm shall consider the relevant provisions of this Agreement and the information provided by the Buyer and the Seller (which will also be made available to the other party) to resolve the dispute. The cost of such Independent Accounting Firm shall be borne (i) by the party whose conclusions

on the Buyer's Final Statement or the Seller's written statement of any discrepancies thereto were further in amount from the conclusion of the Independent Accounting Firm as to the adjustments pursuant to this Section, or (ii) equally by the parties in the event that such conclusion is an equal amount from the aggregate amounts on the Buyer's Final Statement and the Seller's written statement of any discrepancies thereto.

(iii) The adjustments pursuant to this Section 3.3(b) shall become final and binding upon the parties upon the earlier of (i) the failure by Seller to object thereto within the period permitted under, and otherwise in accordance with, the requirements of this Section 3.3(b), (ii) the written agreement between Buyer and Seller with respect thereto, or (iii) the decision by the independent accounting firm with respect to disputes under Section 3.3(b)(ii).

3.4     The Closing. The Closing shall take place at the offices of Nelson Mullins Riley & Scarborough LLP in Greenville, South Carolina on the Closing Date, unless the parties agree to exchange this Agreement and the Transaction Documents via facsimile, electronic mail, or otherwise, in which case this Agreement and the Transaction Documents shall be deemed fully and lawfully executed upon each party's receipt of all necessary counterparts to this Agreement and each of the Transaction Documents. All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously as of the completion of transmittal and delivery of the Closing Date Payment, and no proceeding shall be deemed taken nor any document executed and delivered until all have been taken, executed and delivered. The transfer of the Acquired Assets to the Buyer shall be deemed effective as of 12:01 AM, local time on the Closing Date.

3.5     Items to be Delivered at Closing by the Buyer. At the Closing, the Buyer shall deliver the following items to the Seller:

(a) The Closing Date Payment, as adjusted, by wire transfer of immediately available funds to the account or accounts designated by Seller;

(b) Executed Related Agreements and all other Transaction Documents, certificates and instruments required to be executed by the Buyer hereunder or as may be reasonably requested by the Seller to effect the transactions contemplated herein; and

(c) An (i) executed copy of corporate resolutions authorizing the execution, delivery and performance of this Agreement and the Related Agreements to which it is a party and consummation of the transactions contemplated hereby and thereby, and (ii) executed incumbency certificate; and (iii) executed certificate from an officer of the Buyer certifying that the representations and warranties of the Buyer under this Agreement are true and correct as of the Closing as if made on the Closing Date and that the Buyer has performed and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by the Buyer before or on the Closing Date.

11

3.6    Items to be Delivered at Closing by the Seller. At the Closing, the Seller shall deliver the following items to the Buyer:

(a) Executed Related Agreements and all other Transaction Documents, certificates and instruments required to be executed by Seller hereunder or as may be reasonably requested by the Buyer to effect the transactions contemplated herein;

(b) All consents, certificates or other similar documentation from third parties necessary to assign, transfer or convey the Acquired Assets to the Buyer, in a form and substance reasonably satisfactory to the Buyer;

(c) Releases, payoff statements and satisfactions, or such other documentation as Buyer may reasonably request, with respect to any Encumbrances on or security interests in the Acquired Assets;

(d) All of Seller's Records related to the Business;

(e) An (i) executed copy of corporate resolutions authorizing the execution, delivery and performance of this Agreement and the Related Agreements to which it is a party and consummation of the transactions contemplated hereby and thereby, and (ii) executed incumbency certificate from the Principal; and (iii) executed certificate from the Principal certifying that the representations and warranties of the Seller under this Agreement are true and correct as of the Closing as if made on the Closing Date and that the Seller has performed and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by the Buyer before or on the Closing Date; and

(f) Executed and fully authorized Articles of Amendment of Seller, changing Seller's name from Logic Packaging, Inc.

3.7    Tax Reporting. The parties hereto agree to report the federal, state and local income and other tax consequences of the purchase and sale contemplated hereby in a manner consistent with the allocation of the Purchase Price as set forth on Schedule 3.1 attached hereto and will file IRS Form 8594 on a basis consistent with such allocation, and no party or any of its affiliates will file a tax return or take any position inconsistent therewith upon examination of any tax return, in any refund claim, in any litigation, or otherwise.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF SELLER AND PRINCIPAL

As an inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller and Principal, jointly and severally, hereby represent and warrant to the Buyer as follows:

4.1    Due Organization and Authority.

12

(a) The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of South Carolina, and has all requisite corporate power and authority to own, operate, lease and use its properties and assets and to carry on its business as it is now being conducted. The Principal owns, beneficially and of record, all of the issued and outstanding stock of Seller.

(b) The Seller is duly qualified to do business and in good standing in the State of South Carolina and in all other jurisdictions in which the Seller must be qualified in order to conduct the Business.

4.2    [Intentionally Omitted]

4.3    Due Authorization; Binding Obligation.

(a) Seller has all necessary power and authority to make, execute and deliver the Transaction Documents and to perform such obligations thereunder and no other proceedings on the part of Seller are necessary to authorize this Agreement and the other Transaction Documents to which it is a party and the transactions contemplated hereunder or thereunder. This Agreement and each of the other Transaction Documents to which Seller is a party has been or will be duly executed and delivered and constitutes or will constitute the valid and binding obligation of Seller enforceable against it in accordance with their respective terms.

(b) The Principal has the legal capacity to make, execute and deliver the Transaction Documents to which he is a party and to perform his obligations thereunder This Agreement and each of the other documents to which Principal is a party has been or will be duly executed and delivered and constitutes or will constitute the valid and binding obligation of the Principal enforceable against him in accordance with their respective terms.

4.4    No Conflict or Violation; Consents.    Neither the execution, delivery or performance of this Agreement or the other Transaction Documents to which Seller or the Principal is a party and the consummation of the transactions contemplated hereby or thereby will (i) contravene or violate either of the Seller's Organizational Documents, (ii) violate, conflict with, result in a breach of, or entitle any party to terminate, or declare a default with respect to, any Contract, lease, interest, judgment, order, decree, law, rule or regulation applicable the Seller, the Principal, the Business or to the Acquired Assets (with or without the giving of notice or the passage of time or both), or (iii) require the consent, approval or authorization of any Person, firm, corporation or government entity, which consent or approval has not been obtained. Seller is not a party to, bound by or subject to any agreement, instrument, judgment, injunction or decree of any court or Governmental Body that may restrict or interfere with its performance of this Agreement or any of the other Transaction Documents to which Seller is a party.

4.5    Financial Statements.

(a) Schedule 4.5 reflects true and complete copies of all the Seller's Financial Statements, together with any and all notes thereto.

13

(b) The Financial Statements have been prepared on an income tax basis of accounting, are in accordance with the books and records of the Seller and constitute fair and accurate portrayals of the financial condition and results of operations of the Seller, as of their respective dates or the periods covered thereby

4.6     No Adverse Changes.    Since the Seller Interim Financial Documents Date, the Seller has conducted the Business only in the ordinary course of business in accordance with the Seller's past practices (without extraordinary or unusual transactions) and, except as set forth on Schedule 4.6, the Seller has not:

(a) Suffered any damage, destruction or loss (whether or not covered by insurance) outside the ordinary course of business with respect to the Acquired Assets or the Business;

(b) Entered into any agreement relating to the Business or the Acquired Assets, other than the Letter of Intent and agreements for the purchase or sale of Inventory or Seller Products in the ordinary course of business;

(c) Created, assumed or permitted to exist any Encumbrance on any of the Acquired Assets or on any other properties or assets relating to the Business, except for Permitted Liens or liens for property taxes accrued but not yet due;

(d) Failed to perform any of its obligations under, breached the terms of or defaulted under any Assumed Contract;

(e) Sold, transferred, leased or otherwise disposed of any of the Acquired Assets, except for sales of Inventory or Seller Products in the ordinary course of business;

(f) Instituted, changed or agreed to change any bonus, profit sharing, pension, retirement or other similar arrangement or plan or made any contribution or payment to any such arrangement or plan not required by its terms as in effect on the Seller Interim Financial Documents Date;

(g) Suffered any change, event or condition (including, without limitation, the loss of any customer or supplier) which has had or is likely to have a material adverse effect on the condition (financial or otherwise) of the Business;

(h) Incurred any obligation or Liability, absolute, contingent or otherwise, whether due or to become due, that constitutes, or may constitute, an Encumbrance on any of the Acquired Assets;

(i) Taken any action that would interfere with or prevent performance of this Agreement;

(j) Suffered any change, event or condition that, individually or in the aggregate, has had a material adverse effect the Business; or

14

(k) Agreed to do anything or have done anything that may result in the occurrence of one or more of the foregoing items (a) through (j) of this Section 4.6.

4.7    Title; Condition.

(a) Except as disclosed in Schedule 4.7(a), no Encumbrance exists with respect to the Acquired Assets.

(b) At Closing, the Seller shall have and shall convey to the Buyer at the Closing good and marketable title to all of the Acquired Assets, free and clear from all Encumbrances, except for the Permitted Liens listed on Schedule 4.7(b). The Acquired Assets shall also be free and clear from any and all non-lien claims, suits or debts incurred with respect to any known or unknown creditor or Seller. Seller represents and warrants that none of the Acquired Assets as shown on the Financial Statements shall have been removed from the Seller other than with respect to sales and collections in the ordinary course of business and the Excluded Assets. Except pursuant to this Agreement, neither Seller nor the Principal are a party to any contract or obligation whereby there has been granted to anyone an absolute or contingent right to purchase, obtain or acquire any rights in any of the Acquired Assets or any other portion of the Seller or the Business outside the ordinary course of business.

(c) All of the tangible Acquired Assets are in good operating condition and reasonable state of repair, subject only to ordinary wear and tear.

4.8    Inventory.  Schedule 4.8 is a true and complete list of the inventory of Seller Products as of the close of business on September 4, 2012 (the "Inventory").

4.9    Equipment.  Schedule 4.9 is a true and complete listing of all the equipment, point-of sale systems, furniture, trade fixtures, fixtures, computers, laptops, computer hardware, computer software, security systems, automobiles, cameras, telephones, signs, lighting and furnishings owned by the Seller as of the Closing Date (collectively, the "Equipment").

4.10    Receivables; Payables and Deposits.

(a) Schedule 4.10(a) is a true and complete list of the Seller's accounts receivable, notes receivable, deposits and prepaid assets as of the close of business on September 4, 2012.

(b) Schedule 2.4(a) is a true and complete list of the Seller's accounts payable as of the close of business on September 4, 2012.

(c) Seller does not have any customer deposits.

4.11    Intangible Assets.  Schedule 4.11 sets forth all intangible assets owned by or granted to or from Seller, including, without limitation, all software rights (other than generally available off the shelf or click-wrap software), domain names, domain registrations, e-mail addresses, phone numbers, fax numbers, copyrights, trademarks, patents rights, service rights, trade names (including, without limitation, the trade name "Logic Packaging") and any other

15

intellectual property (collectively, the "Intangible Assets"). There are no other patents, trademarks, copyrights, service marks or trade names that are used solely in the Business or used by the Seller in general. To the Knowledge of Seller the use of any of the Intangible Assets does not and will not infringe on or otherwise violate any patent, trademark, copyright, search mark or trade name and there are no other covenants or agreements concerning the licensing or use of the Intangible Assets. Seller has not received any notice of any adversely held patent, trademark, copyright, service mark or trade name of any other Person or notice of any claim of any other Person relating to any of the Intangible Assets. The execution, delivery and performance of this Agreement and the transactions contemplated hereby will not result in the loss or the impairment of any rights to the Intangible Assets.

4.12    Material Agreements.

(a) All Contracts (or series of related Contracts) relating to the Business and/or the Acquired Assets have been made available to the Buyer. Except as set forth on Schedule 4.12(a), such Contracts were entered into or made by the Seller in the ordinary course of the Seller's business consistent with the Seller's past practices, are valid and in full force and effect, and are held by the Seller subject to any applicable cancellation rights of the Seller's customers.

(b) Schedule 4.12(b) is a true and correct copy of the Seller's lease for the real property located at 420 The Parkway, Suite G-1, Greer, South Carolina 29650 and any and all amendments or modifications thereto (the "Lease"). The Lease was entered into or made in the ordinary course of the Seller's Business consistent with the Seller's past practices and is valid and in full force and effect. The Seller does not lease or own any other real property except for the real property leased under the Lease.

(c) Schedule 4.12(c) attached hereto is a true and accurate listing and description of all oral and written Contracts and purchase orders with respect to the Inventory and/or the Seller Products that exist as of the date hereof, except for such Contracts that are terminable at will by either party thereto without penalty. Such Contracts and purchase orders were entered into or made in the ordinary course of the Seller's business consistent with the Seller's past practices and are valid and in full force and effect.

(d) Schedule 4.12(d) attached hereto is a true and accurate listing and description of all licenses (including but not limited to intellectual property licenses), operating leases, permits and any other documentation that are necessary for the operation of the Business as it is currently conducted. Such licenses, operating leases and other agreements were entered into in the ordinary course of the Seller's business consistent with the Seller's past practices and are in full force and effect. There are no other licenses required under federal, state or local laws for the operation of the Business.

(e) Schedule 4.12(e) attached hereto is a true and accurate listing and description of all the following Contracts to which the Seller is a party:

16

(i) each Contract (or series of related Contracts) that involves delivery or receipt of Seller Products that was not entered into in the ordinary course of business;

(ii) each joint venture, partnership or Contract involving a sharing of profits, losses, costs or Liabilities with any other Person;

(iii) each Contract containing any covenant that purports to restrict the Seller from engaging in the Business or otherwise limit the freedom of the Seller to compete with any Person with respect to the Business;

(iv) each power of attorney;

(v) each written warranty, guaranty or other similar undertaking with respect to contractual performance relating to the Business other than in the ordinary course of business;

(f) Seller has made available to Buyer a correct and complete copy of each written Material Agreement. Each Material Agreement is legal, valid, binding, enforceable, in full force and effect and will continue in full force and effect on the same terms as currently exist, notwithstanding the consummation of the transactions contemplated by this Agreement. The Seller has not miscalculated any rebates or other payments made by or on behalf of any customer or otherwise breached any Material Agreement with any such customer. To the Knowledge of Seller, each Material Agreement, with respect to the other parties to such Material Agreement is legal, valid, binding, enforceable, in full force and effect. The Seller is not in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification or acceleration, under any Material Agreement. To the Knowledge of Seller, no other party is in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification or acceleration, under any Material Agreement. Neither Seller nor, to the Knowledge of Seller, any other party to any Material Agreement has repudiated any provision of any such Material Agreement.

4.13    Customers and Suppliers. Schedule 4.13 is a true and complete list of the Seller's customers and suppliers since the Seller Interim Financial Documents Date. Except as provided on Schedule 4.13, no existing customer or supplier has substantially reduced its business, or provided notice that it will substantially reduce its business, with the Seller. To the Knowledge of Seller and the Principal, there is no customer or supplier that intends to terminate or substantially reduce its business with the Seller or any facts or circumstances that would result in a customer or supplier wanting to terminate or substantially reduce its business with the Seller. No customer of the Seller has cancelled its contract since the Seller Interim Financial Documents Date, except as provided on Schedule 4.13.

4.14    Compliance; Permits. Seller is in compliance in all material respects with all Laws, including without limitation all federal and state securities laws and regulations (including but not limited to all regulations, notices and advisory opinions issued by the Securities and

17

Exchange Commission), and Seller has not received any notice asserting any noncompliance therewith. The Seller has all licenses, permits, authorizations and approvals necessary to carry on the Business as it is currently being conducted, or obtained by the Seller for the conduct of the Business and/or the ownership and operation of the Acquired Assets. Seller has made available to the Buyer complete and accurate copies of all such licenses, permits, authorizations and approvals each of which is currently valid and in full force and effect and is hereby fully assigned to the Buyer.

4.15    Pending or Threatened Litigation. There are no actions, suits or proceedings (legal, governmental or otherwise) pending or, to the Knowledge of Seller or Principal, threatened against Seller, regarding the Business or any Acquired Assets, and neither Seller nor Principal know of any basis therefore, except as disclosed in the attached Schedule 4.15.

4.16    Absence of Undisclosed Liabilities. To the Knowledge of Seller, there does not currently exist, and as of the Closing there will not exist, any Liability or obligation of any nature or in any amount against the Seller that would materially affect the Business or the Acquired Assets. To the Knowledge of Seller, Seller is not in default with respect to any Liabilities or obligations and all such Liabilities or obligations shown or reflected in the Financial Statements have been paid or are being paid and discharged as they become due, except for the Assumed Liabilities.

4.17    Records. The Records and other documents relating to the Acquired Assets, the Business, and/or the Seller's customers and suppliers, which have been supplied to Buyer by Seller or Seller's agents are true, accurate, and complete in all material respects.

4.18    Taxes.

(a) Except as listed and described on Schedule 4.18(a), the Seller has filed all federal, state and local Tax and other returns and reports required to be filed on or before the Closing; all information reported on such returns is true, accurate and complete; and the Seller has paid or accrued (i) any and all taxes shown to be due on such returns and reports, including, without limitation, those due in respect of properties, income, franchises, licenses, sales and payrolls, (ii) all deficiencies and assessments of taxes of which notice has been received by Seller that are or may become an Encumbrance upon any of its assets and (iii) all other taxes due and payable on or before the Closing for which neither filing of tax returns or reports nor notice of deficiency or assessment is required, of which Seller is or should be aware that are or may become an Encumbrance upon any of its assets. The Seller has made all payments of estimated income tax due through the date hereof and all withholdings of tax required to be made under all applicable United States, state and local tax regulations.

(b) Seller has not taken any action that imposes on the Buyer any successor or transferee Liability for any Taxes in respect of the Seller. There are no Encumbrances on any of the Acquired Assets that arose in connection with, or otherwise relate to, any failure (or alleged failure) to pay any tax.

18

4.19    Labor Matters.  Except as listed on Schedule 4.19, (i) Seller is not a party to or subject to any collective bargaining agreements with respect to the Business; (ii) Seller has no written contracts of employment with any of Seller's employees; (iii) Seller has complied in all material respects with all Laws relating to the employment of labor, including, without limitation, those relating to wages, overtime, FLSA classification, hours, collective bargaining, occupational safety, discrimination and the payment of social security and other payroll related taxes; and (iv) no labor union or other collective bargaining unit represents or claims to represent any employee of Seller.

4.20    Employee Benefit Plans.  Except as listed on Schedule 4.20, Seller shall remain fully responsible for all payments and other funding of, and all liability under all employee benefit plans and programs maintained by the Seller, including but not limited to pension, retirement, profit sharing, deferred compensation, stock option, stock ownership, severance, vacation, bonus or other incentive plans, all other written or oral employee programs, arrangements or agreements, all medical, dental or other health plans, all life insurance plans and all other employee benefit plans or fringe benefit plans, including, without limitation, all "employee benefit plans" as that term is defined in Section 3(3) of ERISA, currently adopted, maintained by, sponsored in whole or in part by or contributed to by the Seller or any affiliate thereof for the benefit of the Seller's employees, retirees, dependents, spouses, directors, independent contractors or other beneficiaries, and Seller shall administer the Employee Benefit Plans in accordance with the terms thereof and ERISA.

4.21    Solvency; Bankruptcy Filings.  Seller is solvent and has not incurred nor does it intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by it and of amounts to be payable on or in respect of debts of it).  Seller is not contemplating any voluntary bankruptcy filing under federal or state bankruptcy or insolvency laws, and Seller has not received any information to indicate that an involuntary bankruptcy filing may be commenced against Seller.

4.22    No Brokerage.  There are no brokers or any other parties who are entitled to a commission from Seller or the Principal in connection with this transaction.

4.23    No Misstatements or Omissions.  No representation or warranty contained in this Agreement (including its Schedules) or the Related Agreements to which Seller or Principal is a party contains any untrue statement of a material fact, or omits to state a material fact reasonably necessary to make the statements or facts contained therein or herein not misleading.

## ARTICLE V.

### REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Seller as follows:

5.1    Due Organization and Authority.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of South Carolina

19

and has all requisite corporate power and authority to own, operate, lease and use its properties and assets and to carry on its business as it is now being conducted.

5.2    Due Authorization; Binding Obligation. The Buyer has all necessary power and authority to make, execute and deliver the Transaction Documents and to perform such obligations thereunder and no other proceedings on the part of the Buyer are necessary to authorize this Agreement and the other documents to which it is a party and the transactions contemplated hereunder or thereunder. This Agreement and each of the other documents to which Buyer is a party has been or will be duly executed and delivered and constitutes or will constitute the valid and binding obligation of the Buyer enforceable against it in accordance with their respective terms.

5.3    No Conflict or Violation; Consents. Neither the execution, delivery or performance of this Agreement or the other documents to which the Buyer is a party nor the consummation of the transactions contemplated hereby or thereby will (i) contravene or violate the Buyer's Organizational Documents, (ii) violate, conflict with, result in a breach of, or entitle any party to terminate, or declare a default with respect to, any Contract, lease, interest, judgment, order, decree, law, rule or regulation applicable to the Buyer or its business (with or without the giving of notice or the passage of time or both), or (iii) require the consent, approval or authorization of any Person, firm, corporation or government entity, which consent or approval has not been obtained. The Buyer is neither a party subject to nor bound by any agreement, instrument, judgment, injunction or decree of any court or Governmental Body that may restrict or interfere with its performance of this Agreement.

5.4    Solvency; Bankruptcy Filings. Buyer is solvent and has not incurred nor does it intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by it and of amounts to be payable on or in respect of debts of it). Buyer is not contemplating any voluntary bankruptcy filing under federal or state bankruptcy or insolvency laws, and Buyer has not received any information to indicate that an involuntary bankruptcy filing may be commenced against Buyer.

5.5    No Brokerage. There are no brokers or any other parties who are entitled to a commission from Buyer in connection with this transaction.

5.6    No Misstatements or Omissions. No representation or warranty contained in this Agreement (including its Schedules) or the Related Agreements to which the Buyer is a party contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements or facts contained therein or herein not misleading.

## ARTICLE VI.

## COVENANTS

6.1    Conduct of Business. Seller and Principal, jointly and severally, hereby covenant to the Buyer that, until the Closing, the Seller and the Principal shall:

20

(a) Conduct and operate the Business and the Acquired Assets only in the ordinary course and in a manner consistent with prior and current business practices and operations with the exception of reduced inventory orders;

(b) Preserve the Seller's present business organization and the Seller's relationships with the customers and suppliers of the Business;

(c) Maintain all Acquired Assets and other property of the Business in a state of good repair and in good working order, ordinary wear and tear excepted, and continue to carry and keep in effect the Seller's existing insurance policies as they relate to the Acquired Assets and/or the Business;

(d) Maintain the Records in a manner consistent with the Seller's past practices; and

(e) Duly comply in all material respects with all applicable Laws.

6.2    Negative Covenants.  Seller and Principal, jointly and severally, hereby covenant that, until the Closing, neither the Seller nor the Principal shall, without the prior written consent of the Buyer:

(a) Take any action or fail to take any action that would cause any of the representations and warranties set forth in Article IV hereof to be untrue or incorrect;

(b) Enter into any agreement relating to the Acquired Assets, other than agreements for the purchase or sale of the Inventory in the ordinary course of business;

(c) Fail to perform in any material respect any obligation with respect to the Business or the Acquired Assets under any Material Agreement;

(d) Take any action that would interfere with or prevent performance of this Agreement;

(e) Except for Permitted Liens, create, allow or cause any Encumbrance or Liability or obligation of any nature or in any amount (whether known or unknown, absolute, accrued, contingent or otherwise) to be filed against or attached to any of the Acquired Assets;

6.3    Access to Facilities, Records, Employees Etc.  Between the date hereof and the Closing Date, Seller and Principal shall give or cause to be given to the authorized representatives of the Buyer full access at all reasonable times, for purposes of its due diligence investigations, to Seller's facilities and properties relating to the Business and to all of Seller's books, records, documents and files of every character related to the Business and the Acquired Assets and Material Agreements; provided, however, that the Buyer and its representatives shall use all reasonable efforts to minimize any interference with respect to such investigation on the business operations of Seller.  The Buyer and its authorized representatives shall be entitled to make copies of such books, records, documents and files or other information requested by the Buyer and related to the Business.  Seller shall cooperate with the Buyer in conducting such

21

investigation and promptly upon the Buyer's request shall also provide the Buyer and its authorized representatives reasonable access to the employees, customers and suppliers of the Business during normal business hours to the extent reasonably deemed by the Buyer to be necessary in connection with its due diligence investigations. Such employees shall be instructed to and such customers and suppliers shall be requested to cooperate with the Buyer and to provide such information as the Buyer and its authorized representatives may reasonably request. The Buyer agrees that it will use its best efforts to cause its equity owners, officers, employees, agents and representatives to keep all information obtained pursuant to such investigations confidential and to return such information promptly in the event the transactions contemplated hereby are not consummated.

6.4    Public Announcements. Unless otherwise required by applicable Law, neither Seller nor Principal shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the Buyer, which consent will not unreasonably be withheld, conditioned or delayed.

6.5    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder will be borne and paid by Seller when due. Seller shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

6.6    Bulk Sales Laws. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to Buyer.

## ARTICLE VII.

### CONDITIONS TO THE OBLIGATIONS OF SELLER AND PRINCIPAL

The obligations of Seller and Principal under this Agreement are subject to the satisfaction or waiver of the following conditions on or before the Closing:

7.1    Representations and Warranties. Each of the representations and warranties of the Buyer contained in this Agreement and in any Transaction Document shall have been true and correct in all material respects as of the date when made and shall be deemed to be made again on and shall be true and correct in all material respects as of the Closing Date.

7.2    Covenants and Conditions. The Buyer shall have duly performed and complied fully with all covenants, agreements and conditions required by this Agreement to be performed or complied with by the Buyer before or on the Closing Date.

7.3    No Litigation or Governmental Proceedings. No action or proceeding shall have been instituted before any court or Governmental Body by any third party to restrain or prohibit, or to obtain damages in respect of, the consummation of this Agreement. No party to this Agreement shall have received written notice from any Governmental Body of (i) its intention to institute any action or proceeding to restrain or enjoin or nullify this Agreement or the

22

transactions contemplated hereby, or to commence any investigation into the consummation of this Agreement, or (ii) the actual commencement of such an investigation. The Buyer shall give notice to Seller of any such intent, investigation or inquiry promptly upon receipt of notice of its occurrence.

7.4     Execution and Delivery Requirements.     The Buyer shall have satisfied its execution and delivery requirements for the Closing as set forth in Section 3.5 of this Agreement.

## ARTICLE VIII.

## CONDITIONS TO THE OBLIGATIONS OF THE BUYER

The obligations of the Buyer under this Agreement are subject to the fulfillment of the following conditions before or on the Closing Date:

8.1     Representations and Warranties.     Each of the representations and warranties of Seller and Principal contained in this Agreement and in any Transaction Document shall have been true and correct as of the date when made and shall be deemed to be made again on and shall be true and correct as of the Closing Date.

8.2     Covenants and Conditions.     Seller and Principal shall have duly performed and complied fully with all covenants, agreements and conditions required by this Agreement to be performed or complied with by Seller or the Principal before or on the Closing Date.

8.3     No Litigation or Governmental Proceedings.     No action or proceeding shall have been instituted before any court or Governmental Body by any third party to restrain or prohibit, or to obtain damages in respect of, the consummation of this Agreement.     No party to this Agreement shall have received written notice from any Governmental Body of (i) its intention to institute any action or proceeding to restrain or enjoin or nullify this Agreement or the transactions contemplated hereby, or (ii) the actual commencement of such an investigation. Seller shall give notice to the Buyer of any such intent, investigation or inquiry promptly upon receipt of notice of its occurrence.

8.4     Consents and Approvals.     All consents, approvals, authorizations and filings required to be obtained or made for the valid and effective transfer to the Buyer of the Acquired Assets and the Assumed Liabilities and consummation of the transactions contemplated by this Agreement and the other Transaction Documents shall have been obtained or made.

8.5     No Adverse Change.     There shall have been no material adverse change in the Business or Acquired Assets from the date hereof until the Closing.

8.6     Licenses and Permits.     All licenses and permits that are assignable and necessary for the conduct of the Business shall have been assigned to the Buyer effective as of the Closing Date, with all necessary consents to permit the Buyer to operate the Business under such permits and licenses.

23

8.7    Termination of Encumbrances. All Encumbrances on the Acquired Assets shall have been terminated pursuant to written instruments in form and substance reasonably satisfactory to the Buyer, and therefore, no Encumbrances shall exist with respect to the Acquired Assets except for Permitted Liens.

8.8    Execution and Delivery Requirements. Seller shall have satisfied its execution and delivery requirements for the Closing as set forth in Section 3.6 of this Agreement.

## ARTICLE IX.

## INDEMNIFICATION

9.1    Indemnification of the Buyer. Seller and Principal, jointly and severally, shall indemnify, defend and hold the Buyer and its equity owners, officers, members, managers, employees, agents and representatives harmless from and against any and all Losses by reason of, arising out of or relating to, any of the following:

(a) Any breach of any representation or warranty made by Seller or the Principal in this Agreement or in any other Related Agreement;

(b) Any failure of Seller or Principal to perform or fulfill any of their respective covenants or agreements set forth in this Agreement or in any other Related Agreement on or prior to the Closing Date;

(c) The failure of Seller or Principal to pay when due or otherwise to perform any of the Liabilities of the Business arising prior to Closing other than the Assumed Liabilities;

(d) Any Liability or obligation for breach of contract, breach of warranty, or products liability or similar claim arising from the Seller Products before the Closing;

(e) Any employment dispute, claims and/or charges related to Seller's or Principal's acts or omissions of misconduct before the Closing Date, including, without limitation, claims, charges or actions filed by current or former employees of Seller or applicants for employment with Seller or any of them; and

(f) Any actual or threatened litigation, claim, suit, action or proceeding by any third party arising out of or relating to: (i) Seller's or Principal's conduct on or prior to the Closing Date; (ii) the operation of the Business on or prior to the Closing Date; or (iii) the operation, use or ownership of the Acquired Assets on or prior to the Closing Date; provided, however, that the Seller will not indemnify Buyer for any Losses arising from or relating the operation of the Business after the Closing Date or Buyer's misconduct or negligence.

(g) The parties agree that the Note shall serve as security for the indemnification obligations of Seller and Principal under this Section 9.1 and Buyer shall have the right to offset any payments due under the Note by reducing such payments by any amount owed to Buyer pursuant to this Section 9.1; provided, however, that Buyer must provide notice

to Seller of any intent to set-off hereunder and provide Seller with an opportunity to dispute such set-off.

9.2    Indemnification of Seller.   Buyer shall indemnify, defend and hold the Seller, Principal and Seller's officers, members, managers, employees, agents and representatives harmless from and against any and all Losses by reason of, arising out of or relating to any of the following:

(a) Any breach of any representation or warranty made by the Buyer pursuant to this Agreement;

(b) Any failure of the Buyer to perform any of its covenants or agreements set forth in the Agreement or in any other Related Agreement; or

(c) Any Liability or any litigation, proceeding or claim by any third party, insofar as any of the foregoing arises out of (i) the Buyer's operation of the Business after the Closing Date; (ii) the Buyer's ownership, operation or use of the Acquired Assets following the Closing Date; provided, however, that the Buyer will not indemnify Seller or Principal for any Losses arising from or relating the operation of the Business on or prior to the Closing Date or Seller's or Principal's misconduct or negligence; or (iii) the employee benefit plan(s) adopted by Buyer following the Closing for Seller's employees who are employed by Buyer after the Closing.

9.3    Losses.   References herein to "Loss" or "Losses" shall mean any and all damages, claims, losses, expenses, costs, causes of action, obligations and liabilities, including, without limitation, reasonable attorneys' fees, interest, penalties, consultants' and experts' fees and all amounts paid in investigation, defense or settlement of the foregoing, including such fees incurred in connection with the enforcement of any rights under this Agreement.

9.4    Notice of Claims.   All claims for indemnification under this Agreement shall be resolved in accordance with the following procedures:

(a) If an indemnified party reasonably believes that it may incur any Loss, it shall deliver written notice to the indemnifying party of the facts which are the basis of an indemnification claim hereunder and setting forth an estimated amount of such potential Loss, if possible, and the section(s) of this Agreement upon which the claim for indemnification for such Loss is based (a "Claim Notice"). If an indemnified party receives notice of a third party claim for which it intends to seek indemnification hereunder, it shall give the indemnifying party prompt written notice of such claim, so that the indemnifying party's defense of such claim under Section 9.5 below.

(b) When a Loss actually is incurred or paid by an indemnified party or on an indemnified party's behalf or otherwise fixed or determined, the indemnified party shall notify the indemnifying party in writing of its claim for payment for such Loss, in reasonable detail and specifying the amount of such Loss (a "Payment Certificate"). Except as set forth in Section 9.5 below, the indemnified party may submit a Payment Certificate without having first submitted a Claim Notice. If a Claim Notice or Payment Certificate refers to any claim, action, suit or proceeding made or brought by a third

25

party, the Claim Notice or Payment Certificate shall include copies of the claim, any process served and all legal proceedings with respect thereto.

(c) If, after receiving a Claim Notice or a Payment Certificate, the indemnifying party desires to dispute such claim set forth in the Claim Notice or the amount claimed in the Payment Certificate, it shall deliver to the indemnified party, a written objection (a "Counternotice") to such claim or payment setting forth the basis for disputing such claim or payment. Such Counternotice shall be delivered within thirty (30) days after the date the Claim Notice or the Payment Certificate to which it relates is received by the indemnifying party. If no such Counternotice is received within the aforementioned thirty (30) day period, the indemnified party shall be entitled to prompt payment for such Loss from the indemnifying party.

(d) If, within thirty (30) days after receipt by an indemnified party of the Counternotice to a Claim Notice or a Payment Certificate, the parties shall not have reached agreement as to the claim or amount in question, the claim for indemnification shall be submitted to arbitration in Greenville, South Carolina pursuant to the Commercial Rules (the "Rules) of the American Arbitration Association ("AAA") by an arbitrator mutually agreed upon by the parties. Such arbitrator shall be selected by the parties hereto no later than ten (10) days after AAA notifies each party that a demand for arbitration has been filed (the "Arbitrator Designation Period"). In the event the Buyer and Seller are unable to agree on an arbitrator within the Arbitrator Designation Period, AAA shall appoint a neutral arbitrator in accordance with the Rules no later than ten (10) days following the expiration of the Arbitrator Designation Period. The designated arbitrator shall not be an agent, employee, shareholder or affiliate of the Buyer or Seller. The arbitrator may, in his or her discretion, award to the prevailing party its costs of the proceeding, including reasonable attorneys' fees and expenses. The decision of the arbitrator shall be final and binding on the parties, and judgment upon the decision may be entered in any court having jurisdiction over the subject matter or the parties.

(e) With respect to any Loss based upon an asserted liability or obligation to a Person or entity not a party to this Agreement for which indemnification is being claimed, the obligations of the indemnifying party hereunder shall not be reduced as a result of any action by the party furnishing the notice of third party claim responding to such claim if such action is reasonably required to minimize damages or to avoid a forfeiture or penalty or to comply with a requirement imposed by law.

9.5    Defense of Third Party Claims. The indemnifying party under this Article IX shall have the right to conduct and control, through counsel of its own choosing, which counsel shall be reasonably acceptable to the indemnified party, any third party claim, action or suit, but the indemnified party may, at its election, participate in or monitor the defense of any such claim, action or suit at its sole cost and expense. Except with the prior written consent of the indemnified party, no indemnifying party, in the defense of such claim or litigation, shall consent to entry of any judgment or order, interim or otherwise, or enter into any settlement that provides for injunctive or other equitable or non-monetary relief affecting the indemnified party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such indemnified party of a release from all liability with respect to such claim or litigation. In the

26

event that the indemnified party shall in good faith determine that the indemnified party may have available to it one or more defenses or counterclaims that are inconsistent with one or more of those that may be available to the indemnifying party in respect of such claim or any litigation relating thereto, the indemnified party shall have the right at all times to take over and assume control over the defense, settlement, negotiations or litigation relating to such claim at the sole cost of the indemnified party; provided, however, that if the indemnified party does so take over and assume control, the indemnified party shall not settle such claim or litigation without the written consent of the indemnifying party, such consent not to be unreasonably withheld. In the event that the indemnifying party does not accept the defense of any matter as above provided, the indemnified party shall have the full right to defend against any such claim or demand and shall be entitled to settle or agree to pay in full such claim or demand. In any event, the indemnifying party and the indemnified party shall cooperate in the defense of any claim or litigation subject to this Section and the records of each shall be available to the other with respect to such defense.

9.6    Survival of Representations, Warranties, Covenants and Agreements.    The representations, warranties, covenants and agreements of Seller and the Buyer set forth in this Agreement shall survive the Closing and shall remain in full force and effect for a period of two (2) years following the Closing Date, provided, however, that with respect to any such claim for which a Claim Notice has been issued prior to the expiration of this two (2) year period, such claim shall survive without limitation until such time as the Claim Notice is resolved consistent with the provisions of this Article IX.

9.7    Limitations on Indemnification.

(a) The Seller and Principal shall not have any liability with respect to, or obligation to indemnify for, Losses under Section 9.1 hereof unless the aggregate amount of Losses for which the Seller and Principal would, but for the provisions of this Section 9.7(a), be liable to indemnify exceeds, on an aggregate basis, Ten Thousand Dollars ($10,000), but in such event the obligations of the Seller and Principal under Section 9.1 hereof will be only to the extent that such Losses exceed Ten Thousand Dollars ($10,000).

(b) The Buyer shall not have any liability with respect to, or obligation to indemnify for, Losses under Section 9.2 hereof unless the aggregate amount of Losses for which the Buyer would, but for the provisions of this Section 9.7(b), be liable to indemnify exceeds, on an aggregate basis, Ten Thousand Dollars ($10,000), but in such event the obligations of the Buyer under Section 9.2 hereof will be only to the extent that such Losses exceed Ten Thousand Dollars ($10,000).

(c) Notwithstanding anything in this Agreement to the contrary, the maximum indemnification liability of the Seller and Principal under Section 9.1 shall not exceed Seven Hundred Fifty Thousand Dollars ($750,000.00) in the aggregate.

(d) Notwithstanding anything in this Agreement to the contrary, the maximum indemnification liability of the Buyer under Section 9.2 shall not exceed Seven Hundred Fifty Thousand Dollars ($750,000.00) in the aggregate.

27

(e) The indemnification provisions set forth in this Article IX shall be the sole and exclusive remedy for monetary damages available to any indemnified party under this Agreement, regardless of whether a claim is brought pursuant to this Agreement or otherwise and regardless of the theory upon which the claim is based, whether contract, tort, warranty, strict liability, federal or state securities law, or any other theory of liability; provided that any indemnified party may seek specific performance or other equitable remedies.

(f) The amount of any and all Losses for which indemnification is provided pursuant to this Article IX shall be net of any amounts actually received in cash by the indemnified party under insurance policies in effect relating to such Losses. The Parties agree to use commercially reasonable efforts to claim and diligently pursue any and all such recoveries.

(g) NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO INDEMNIFIED PARTY SHALL BE ENTITLED TO INDEMNIFICATION PURSUANT TO THIS ARTICLE IX FOR ANY CONSEQUENTIAL, EXEMPLARY, PUNITIVE, SPECULATIVE, INDIRECT OR SPECIAL DAMAGES (COLLECTIVELY "EXCLUDED DAMAGES") SUFFERED BY SUCH INDEMNIFIED PARTY.

## ARTICLE X.

### ADDITIONAL COVENANTS AND AGREEMENTS

10.1    Warranties. Seller hereby assigns to the Buyer all of its rights, title and interest in and to such warranties (express and implied) that continue in effect with respect to the Acquired Assets and hereby nominate the Buyer as its true and lawful attorney to enforce such warranties, and Seller shall execute and deliver such specific assignments of such warranty rights as the Buyer may reasonably request from time to time.

10.2    Further Assurances. Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably necessary to carry out the provisions of this Agreement and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

10.3    Access; Mail. From time to time following the Closing, upon the reasonable request of the Buyer, Seller shall afford the Buyer and its authorized representatives access to the Seller's business records, general ledgers and tax returns relating to the Business, to the extent reasonably necessary for the Buyer's business, tax, accounting or legal purposes, and shall permit the Buyer to make copies thereof at the Buyer's sole expense. From and after the Closing Date, the Buyer will have the right to receive all mail addressed to Seller to the extent such mail relates to the Acquired Assets or the Business; provided, however, that the Buyer will promptly forward to Seller any mail sent to the Buyer which appears to relate to assets other than the Acquired Assets or to agreements other than the Material Agreements.

10.4    Employee Offers.  Seller acknowledges that the Buyer is under no obligation to offer employment to any of the Seller's employees.  Seller agrees to make available to the Buyer on and after the Closing any and all records with respect to such employees hired by the Buyer as the Buyer shall reasonably request.

10.5    Seller Consultation Services.  From the Closing Date until December 31, 2012, Buyer shall retain Seller as a consultant to provide a minimum of forty (40) hours of consultation services each week, or such other amount as requested by Buyer, and Buyer shall pay Seller a monthly rate of Ten Thousand Dollars ($10,000) for such consultation services.  Buyer and Seller acknowledge that Seller shall be an independent contractor, and not an employee, of Buyer during such time.

10.6    Principal Insurance.  From January 1, 2013 until August 31, 2013, as further consideration hereunder, Buyer shall pay for the cost of any continued or substitute family medical and dental coverage for the Principal and his current dependents, up to a maximum of One Thousand Dollars ($1,000) per month.  Such insurance coverage shall be similar to the normal and customary medical and dental insurance policies obtained by Buyer for its employees; provided, however, that Buyer and Principal acknowledge that Principal shall not be an employee of Buyer during such time.  Notwithstanding the foregoing, the Buyer's obligations under this Section 10.6 shall cease if Principal (i) becomes an employee of Buyer on or after January 1, 2013 and is covered under the medical and dental insurance policies obtained by Buyer for its employees; or (ii) receives medical and dental coverage under an employer's or any other third party's insurance policies on or after January 1, 2013.

10.7    Termination.  This Agreement may, by written notice given prior to or at the Closing, be terminated:

(a)  By mutual consent of the Buyer, the Seller and the Principal; or

(b)  At any time, by the Buyer, the Seller or the Principal, if the Closing shall not have occurred, on or before September 15, 2012

(c)  If this Agreement is terminated pursuant to this Section 10.7, all further obligations of the parties under this Agreement shall terminate.  Each party's rights of termination under Section 10.7 are in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination shall not constitute an election of remedies.

## ARTICLE XI.

## NON-COMPETITION AND CONFIDENTIALITY

11.1    Non-competition Covenants.  Seller and Principal each hereby agree that, for a period of five (5) years following the Closing (the "Restricted Period"), neither Seller nor Principal shall, on behalf of itself or himself, as the case may be, or on behalf of any other Person (specifically including, without limitation, Principal's spouse or any other family member of Principal), directly or indirectly, in any capacity (as an employee, partner, independent

29

contractor, shareholder, director, officer, manager, consultant or otherwise), enter into, conduct or carry on, engage in, be employed by, perform services for, invest capital in, lend knowledge, assistance or money to, be concerned with or interested in, financially or otherwise, any business that competes with the Business in any form or manner or provides products or services that are similar or reasonably substitutable for the products and services offered by the Company or the Buyer in any state within the Territory (a "Restricted Business"). For purposes of this Article XI, the term "Territory" shall mean South Carolina, North Carolina, Virginia, Georgia, Mississippi and Tennessee, which Seller and Principal expressly agree represents the actual geographic territory of the business interests being conveyed by them pursuant to this Agreement.

   11.2   Non-Solicitation of Clients and Customers. Seller and Principal each hereby agree that, during the Restricted Period, neither Seller nor Principal shall, on behalf of itself or himself, as the case may be, or on behalf of any other Person (specifically including, without limitation, Principal's spouse or any other family member of Principal), directly or indirectly: (i) offer, solicit or accept any business from any Person in the Territory that is (or in the preceding two (2) years was), at the time of such solicitation, a client or customer of the Buyer or the Seller (a "Customer"); provided, however, that the foregoing provision shall not apply if such offer, solicitation or acceptance of business does not, in any form or manner, relate to the packaging industry, compete with the Buyer or the Business, or provide products or services that are similar to or reasonably substitutable for any Seller Product or other product or service offered by the Buyer or the Seller; (ii) cause or attempt to cause any Customer, or any Subsidiaries or Affiliates of a Customer, not to do business with Buyer; or (iii) otherwise interfere, or attempt to interfere, with any business relationship between Buyer and any Customer.

   11.3   Non-Solicitation of Employees.  Seller and Principal each hereby agree that, during the Restricted Period, neither Seller nor Principal shall, on behalf of itself or himself, as the case may be, or on behalf of any other Person (specifically including, without limitation, Principal's spouse or any other family member of Principal), directly or indirectly, solicit, hire, employ, or induce or influence to terminate or modify his or her relationship with Buyer, or attempt to do any of the foregoing, anyone who is (or in the preceding six (6) months was), at the time of such solicitation, an employee, director, independent contractor (including, without limitation, any supplier, distributor or other service provider) or other proprietary contact of Buyer, Seller or Principal, except as expressly otherwise provided for in Sections 11.3(a) or 11.3(b) below.

   (a)   Subject to Seller's and Principal's compliance with the terms and conditions of this Article XI, the provisions of Section 11.3 shall not apply to Christina Davidson.

   (b)   Subject to (i) the execution and delivery by Quinn Davidson of a non-competition agreement containing terms similar to those set forth in this Article XI and reasonably satisfactory to the Buyer; and (ii) the Seller's and Principal's compliance with the terms and conditions of this Article XI, after a period of one (1) year following the Closing and upon at least sixty (60) days notice prior to any solicitation, hiring or employment, Seller or Principal may solicit, hire or employ Quinn Davidson.

   11.4   Confidentiality.   Seller and Principal acknowledges they each have enjoyed unrestricted access to the confidential and proprietary information of Seller (hereinafter the

30

"Confidential Information") which is being conveyed without reservation to Buyer pursuant to this Agreement. Confidential Information shall be defined to include, without limitation, all proprietary business information related to Seller's business operations and customers, the identities of the current, former or prospective employees, suppliers and customers of Seller, development, transition and transformation plans, methodologies and methods of doing business, strategic, marketing and expansion plans, financial and business plans, financial data, pricing information, employee lists and telephone numbers, locations of sales representatives, new and existing customer or supplier programs and services, customer terms, customer service and integration processes, and requirements and costs of providing services, support and equipment. In light of the foregoing, and as a material inducement to the Buyer to enter into this Agreement, Seller and Principal covenant and agree that they each shall not, directly or indirectly, at any time during the Restricted Period: (i) disclose any Confidential Information to any person or entity other than the Buyer for any reason; or (ii) make use of any Confidential Information without the prior written consent of Buyer, which consent may be granted or withheld in Buyer's sole discretion; provided, however, that the foregoing restrictions in this Section 11.4 shall not apply to the operation of any business established by Seller or Principal outside the Territory, which is otherwise in compliance with the provisions of Sections 11.1, 11.2 and 11.3 above. Seller and Principal each agree to take all reasonable steps that are necessary to safeguard the secrecy and confidentiality of, and the Buyer's proprietary rights to, the Confidential Information. As noted above, the obligations of Seller and Principal with respect to Confidential Information shall continue through the Restricted Period. Seller's and Principal's obligations not to disclose any Confidential Information that constitutes a "trade secret" (as defined under the South Carolina Uniform Trade Secrets Act), however, shall continue for as long as such information remains a trade secret. The parties agree that this Section 11.4 is not intended to restrict the use or disclosure of any information which: (i) is now or later made known to the public through legal means and no fault of Seller or Principal; (ii) is disclosed by Seller or Principal after receipt of written permission from the Buyer; or (iv) is disclosed as required by court order, subpoena other court process.

11.5  Acknowledgement. Seller and Principal each explicitly recognize, acknowledge, agree represent and warrant to Buyer, as a material inducement to Buyer's payment of the Purchase Price and consummation of the transactions contemplated hereby, that (i) Buyer is purchasing the Business and the Acquired Assets relating thereto, including customer lists, going concern value and goodwill of the Business, from Seller and Principal; (ii) the Seller's customers have serviceable locations throughout the Territory, the Territory reflects an accurate portrayal of where the Seller's customers are located and Buyer has relied on Seller and Principal for purposes of defining the Territory; (iii) one of the key purposes of Buyer's purchase of the Business is to acquire the Seller's goodwill and customers in the Territory; (iv) Buyer has a reasonable and legitimate business interest in protecting the Customers from solicitation for a limited period of time following the Closing; (v) Seller and Principal have each carefully reviewed the above categories of competition and that such categories accurately reflect the scope of the Buyer's purchase of the Seller's customers, goodwill and going concern within its specific business niche in the marketplace and that the above restrictions against such competition are fairly and reasonably defined in a narrow manner in order to protect the legitimate interests of the Buyer as a purchaser of the Acquired Assets and the Business; and (vi) the enforcement of this Agreement by injunction or otherwise will not prevent Seller or Principal

31

from earning a livelihood or impose any undue hardship, economic or otherwise, on Seller or Principal.

11.6    Enforcement and Damages. The parties acknowledge and agree that the restrictions set forth in this Article XI are necessary to prevent the use and disclosure of Confidential Information and loss of goodwill, and to protect other legitimate business interests of the Parties. As applied to the geographical areas and other operative categories described above, the Parties agree that the provisions of this Article XI are completely severable from and independent of any other provision of this Agreement. If any of the provisions or covenants set forth in this Article XI are held to be unenforceable in any jurisdiction because of the duration and/or scope of such provision or covenant, the parties hereby authorize the court making such determination to reduce the duration and scope of such provision or covenant to the extent necessary to make such provision or covenant enforceable, and in its reduced form, said provision or covenant shall be enforceable; provided, however, that the determination of such court shall not affect the enforceability of this Agreement in any other jurisdiction. The Seller and Principal acknowledge and agree that the restrictive covenants set forth in this Article XI are a material part of their respective obligations under this Agreement and that a breach by Seller or Principal of any covenant set forth in this Article XI will cause Buyer irreparable injury that cannot be adequately compensated by monetary damages alone. Accordingly, notwithstanding any election by a party to make a claim for damages as a result of such failure or refusal, such party may, in addition to any other remedies and damages available, seek an injunction in a court of competent jurisdiction to compel performance of the obligations of the other party under this Agreement or to restrain any breach of this Agreement by the other party. In the event of any action, suit or arbitration proceeding arising out of or relating to this Agreement or any breach or alleged breach hereof, the party prevailing in any such action, suit or proceeding shall be entitled to recover from the other party, in addition to all other damages recoverable, such reasonable attorneys' fees and other reasonable expenses of the proceeding as the prevailing party may incur. Seller and Principal also agree that the time period for which any covenant or restriction is agreed to last will be increased by one day for every day that Seller and/or Principal are in violation of the covenant or restriction.

## ARTICLE XII.

## MISCELLANEOUS

12.1    Expenses. Except as specifically provided in this Agreement, each party hereto shall bear all of its expenses incurred in connection with the transactions contemplated by this Agreement, including, without limitation, accounting, legal and brokerage fees incurred in connection therewith.

12.2    Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

12.3    Notices. All notices, demands and other communications that are required or permitted to be given hereunder or with respect hereto shall be in writing, shall be given either by personal delivery, by nationally recognized overnight courier or by telecopy and shall be deemed to have been given or made when personally delivered, when deposited with charges

32

prepaid with the nationally recognized overnight courier, or when transmitted on telecopy machine, addressed to the respective parties as follows:

If to Buyer:

Logic Packaging Acquistion, LLC
Attn: Derrick Murdock
P.O. Box 2009
Fountain Inn, South Carolina 29644
Phone: (864) 862-1500
E-mail: dmurdock@ipack.com

with a copy (which shall not constitute notice) to:

Nelson Mullins Riley & Scarborough LLP
Attn: John M. Campbell, Jr.
104 South Main Street, Suite 900
Greenville, South Carolina 29601
Phone: (864) 250-2234
E-mail: john.campbell@nelsonmullins.com

If to Seller:

Logic Packaging, Inc.
Attn: Geordy William Douglas Davidson
27 Cedar Rock Drive
Greer, South Carolina 29650
Phone: (864) 517-7835
E-mail: Geordy@LogicPackaging.com

If to Principal:

Geordy William Douglas Davidson
27 Cedar Rock Drive
Greer, South Carolina 29650
Phone: (864) 517-7835
E-mail: Geordy@LogicPackaging.com

in each case, with a copy (which shall not constitute notice) to:

Greyrock Management Solutions, LLC
Attn: Scott Wigginton
135 South Main, Suite 701
Greenville, South Carolina 29601
Phone: (864) 552-1781
Email: swigginton@greyrockmgmt.com

33

and

Merline & Meacham, P.A.
Attn: Douglas B. O'Neal
PO box 10796
Greenville, South Carolina 29603
Phone: (864) 242-4080
Email: doneal@merlineandmeacham.com

Any party may by notice change the address to which notice or other communications to it are to be delivered or mailed.

12.4    Captions.  The captions of Articles and Sections of this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

12.5    Law Governing.  This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of South Carolina.

12.6    Amendments, Waivers, Etc.  No amendment, modification or discharge of this Agreement, and no waiver of any condition or the breach of any provision, term, covenant, representation or warranty hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement, and shall not impair the rights of the party granting such waiver in any other respect or at any other time. The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right at a later date to enforce the same or to enforce any future compliance with or performance of any of the provisions hereof.

12.7    Entire Agreement.  This Agreement, together with the Related Agreements and the Transaction Documents, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes and cancels any and all prior agreements and understandings, both written and oral, among them relating to the subject matter hereof.

12.8    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

12.9    ARBITRATION.    ANY  DISPUTE,  CONTROVERSY  OR  CLAIM, INCLUDING WITHOUT LIMITATION ANY CLAIM FOR BREACH OF CONTRACT, ARISING OUT OF OR IN CONNECTION WITH, OR RELATING TO, THIS AGREEMENT

OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL, UPON THE REQUEST OF ANY PARTY INVOLVED, BE SUBMITTED TO, AND SETTLED BY, ARBITRATION IN THE CITY OF GREENVILLE, SOUTH CAROLINA, PURSUANT TO THE COMMERCIAL ARBITRATION RULES THEN IN EFFECT OF THE AAA (OR AT ANY TIME OR AT ANY OTHER PLACE OR UNDER ANY OTHER FORM OF ARBITRATION MUTUALLY ACCEPTABLE TO THE PARTIES SO INVOLVED). ANY AWARD RENDERED SHALL BE FINAL AND CONCLUSIVE UPON THE PARTIES AND A JUDGMENT THEREON MAY BE ENTERED IN THE HIGHEST COURT OF THE FORUM, STATE OR FEDERAL, HAVING JURISDICTION. THE EXPENSES OF THE ARBITRATION SHALL BE BORNE EQUALLY BY THE PARTIES TO THE ARBITRATION, PROVIDED THAT EACH PARTY SHALL PAY FOR AND BEAR THE COST OF ITS OWN EXPERTS, EVIDENCE AND COUNSEL FEES, EXCEPT THAT IN THE DISCRETION OF THE ARBITRATOR, ANY AWARD MAY INCLUDE THE COST OF A PARTY'S COUNSEL IF THE ARBITRATOR EXPRESSLY DETERMINES THAT THE PARTY AGAINST WHOM SUCH AWARD IS ENTERED HAS CAUSED THE DISPUTE, CONTROVERSY, OR CLAIM TO BE SUBMITTED TO ARBITRATION AS A DILATORY TACTIC. THIS GENERAL ARBITRATION CLAUSE SHALL BE READ IN A MANNER CONSISTENT WITH THE MORE SPECIFIC ARBITRATION PROVISION SET FORTH IN ARTICLE IX. THE ARBITRATION PROVISIONS CONTAINED IN THIS AGREEMENT SHALL BE GOVERNED TO THE MAXIMUM EXTENT POSSIBLE PURSUANT TO THE FEDERAL ARBITRATION ACT.

12.10 Meaning of Knowledge. Any reference in this Agreement or in any other Transaction Document to a party's "Knowledge" (or other similar expressions relating to the knowledge or awareness of a party) shall mean and include all matters that (i) are actually known by such party; or (ii) would have been known by such party after due inquiry.

12.11 Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument. This Agreement and the Related Agreements and Transaction Documents may be exchanged by the parties via facsimile or electronic mail and such electronic copies may be utilized by the parties to the same extent as an original.

[Signature Pages to Follow]

35

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BUYER:
Logic Packaging Acquisition, LLC, a South Carolina limited liability company

By: _____(SEAL)
Name: Derrick Murdock
Title: Authorized Member

SELLER:
Logic Packaging, Inc., a South Carolina corporation

By: _____(SEAL)
Name: Geordy William Douglas Davidson
Title: President

Attest:

By: _____
Name : _____
Title: Secretary

[Corporate Seal]

PRINCIPAL:

_____
Geordy William Douglas Davidson

36

## EXHIBIT A

### ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this *"Assignment"*), effective as of September 5th, 2012, is by and between **LOGIC PACKAGING, INC.**, a South Carolina corporation (the *"Assignor"*), and **LOGIC PACKAGING ACQUISITION, LLC**, a South Carolina limited liability company (the *"Assignee"*).

WHEREAS, Assignor, Assignee and Geordy William Douglas Davidson, are parties to that certain Asset Purchase Agreement dated as of even date herewith (the *"Purchase Agreement"*); and

WHEREAS, in accordance with the Purchase Agreement, Assignor has agreed to transfer and assign its interest in certain agreements, contracts and commitments to Assignee and Assignee has agreed to assume Assignor's obligations under such agreements, contracts and commitments from Assignor, pursuant to the terms of this Assignment

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements set forth herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee, intending to be legally bound, hereby agree as follows:

1.      Assignment by Assignor.  Assignor hereby sells, transfers, conveys and assigns to Assignee all of Assignor's right, title and interest in and to, and all of Assignor's burdens, obligations and liabilities in connection with, the Acquired Assets as set forth in the Purchase Agreement.

2.      Assumption by Assignee.  Assignee hereby assumes and agrees to observe, perform, pay and discharge all of Assignor's obligations under the Assumed Liabilities as set forth in the Purchase Agreement to be observed, performed, paid or discharged from and after the Closing.

3.      Further Assurances.  Assignor hereby covenants and agrees that it will from time to time, upon request by Assignee, promptly execute and deliver such further instruments of assignment, transfer, conveyance, endorsement or authorization, or any other similar instrument, as Assignee may reasonable require in order to carry out more effectively the purposes of this Assignment.

4.      Defined Terms.  Unless otherwise indicated, capitalized terms used in this Assignment that are not defined herein shall have the meanings assigned to them in the Purchase Agreement.

5.      Terms of the Purchase Agreement.  This Assignment is executed and delivered in connection with, and pursuant to the terms of, the Purchase Agreement. Notwithstanding anything herein to the contrary, nothing herein shall in any way vary the promises, agreements, representations, warranties and covenants of the parties to and set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and this Assignment, the terms of the Purchase Agreement shall govern.

6.      Headings.  The headings contained in this Assignment as to the contents of particular sections or other subdivisions contained herein are inserted for convenience of reference only and are in no way to be construed as part of this Assignment or as limitations on the scope of particular sections or other subdivisions to which they refer and shall not affect the interpretation or meaning of this Assignment.

7.      Governing Law.  This Assignment shall be governed by, controlled, construed and enforced in accordance with the laws of the State of South Carolina, without regard to its choice of laws principles.

8.      Successor and Assigns.  This Assignment shall bind and inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

9.      Counterparts.  This Assignment may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*Execution Page to Follow*

[Remainder of Page Intentionally Left Blank]

2

Execution Page to Assignment and Assumption Agreement

IN WITNESS WHEREOF, this Assignment has been duly executed and delivered by the parties hereto effective as of the date set forth above.

**ASSIGNOR:**

**LOGIC PACKAGING, INC.**

By: _____
Name:  Geordy William Douglas Davidson
Title:    President

**ASSIGNEE:**

**LOGIC PACKAGING ACQUISITION, LLC**

By: _____
Name:  Derrick Murdock
Title:    Authorized Member

3

**EXHIBIT B**
INTENTIONALLY OMITTED

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("Assignment"), dated as of the 5th day of September, 2012 (the "Effective Date"), is by and between Logic Packaging, Inc., a South Carolina corporation  ("Assignor"), and Logic Packaging Acquisition, LLC, a South Carolina limited liability company ("Assignee"), with the consent of PPT Holdings LLC, a South Carolina limited liability company ("Lessor").

### WITNESSETH:

WHEREAS, Assignor is the Lessee of certain improved real property located in Greenville County, South Carolina, commonly known as 420 The Parkway, Suite G-1, Greer, South Carolina 29650 (the "Demised Premises"), pursuant to that certain Lease Agreement dated February 16, 2012 between Assignor and Lessor (the "Existing Lease"); and

WHEREAS, Assignor desires to assign all of its right, title and interest in and to the Existing Lease to Assignee, and Assignee desires to assume all of Assignor's duties and obligations under the Existing Lease.

NOW, THEREFORE, in accordance with that certain Asset Purchase Agreement dated as of September 5th, 2012, by and among Assignor, Geordy William Douglas Davidson (the *"Principal"*), and Assignee, incorporated herein by reference and made a part hereof (the *"Purchase Agreement"*), and other good and valuable considerations, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor does hereby assign, transfer and convey to Assignee all of Assignor's right, title and interest as "Lessee" under the Existing Lease, and Assignee does hereby accept and assume all of Assignor's duties and obligations as "Lessee" under the Existing Lease.

2. Assignee acknowledges and agrees that (i) its possession of the Demised Premises shall be subject to all the covenants, obligations and conditions set forth in the Existing Lease; and (ii) Assignee shall perform and comply with all such covenants, obligations and conditions that arise on or after the Effective Date.

3. Lessor hereby consents to this Assignment by Assignor to Assignee and agrees to release and hold harmless Assignor from any and all liability, obligations, duties, terms, covenants and/or conditions arising from, under or in connection with the Existing Lease. Notwithstanding anything contained in the Existing Lease to the contrary, Lessor agrees to look solely to Assignee for performance of the provisions of the Existing Lease.

*Execution Pages to Follow*

1

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Assumption of Lease to be executed in form binding upon authority duly given, as of the Effective Date.

**ASSIGNOR**:

LOGIC PACKAGING, INC.

By: _____
Name: Geordy William Douglas Davidson
Title:   President


**ASSIGNEE**:

LOGIC PACKAGING ACQUISITION, LLC

By: _____
Name:   Derrick Murdock
Title:   Authorized Member

2

IN WITNESS WHEREOF, Lessor has caused this Assignment and Assumption of Lease to be executed in form binding upon authority duly given, as of the Effective Date.

**LESSOR**:

PPT Holdings, LLC

By: _____
Name:
Title:

## EXHIBIT D

### BILL OF SALE

FOR VALUE RECEIVED, and in accordance with that certain Asset Purchase Agreement dated as of September 5th, 2012, by and among Logic Packaging, Inc., a South Carolina corporation (*"Seller"*), Geordy William Douglas Davidson, and Logic Packaging Acquisition, LLC, a South Carolina limited liability Company (*"Buyer"*), incorporated herein by reference and made a part hereof (the *"Purchase Agreement"*), the Seller does hereby sell, assign, transfer, deliver, and convey to the Buyer all of Seller's right, title, and interest in and to all of the Acquired Assets (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD said Acquired Assets unto Buyer, its successors and assigns forever, and Seller agrees to defend the title of such Acquired Assets unto Buyer, its successors and assigns against all persons whomsoever consistent with the terms of the Purchase Agreement.

THIS BILL OF SALE is given pursuant and subject to the limitations, terms and provisions of the Purchase Agreement, being further documentation of the sale, conveyances, assignments, and transfers provided for in and by the Purchase Agreement, and does not expand upon or limit the rights and obligations therein provided. In the event of any conflict between the terms hereof and those of the Purchase Agreement, the Purchase Agreement shall be deemed controlling.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed under seal as of the 5th day of September, 2012.

**SELLER:**

Logic Packaging, Inc.

By: _____

        Geordy William Douglas Davidson,
        President

Signed, sealed, delivered and sworn to before me this _____ day of September, 2012.

_____

NOTARY PUBLIC
My commission expires_____

1

**EXHIBIT E**

**NEGOTIABLE PROMISSORY NOTE**

**$350,000.00**                                                    **Greenville, South Carolina**
                                                                    **As of September 5, 2012**

(1)    <u>Borrower's Promise to Pay</u>. FOR VALUE RECEIVED, LOGIC PACKAGING
ACQUISITION, LLC ("Borrower") at 10 Jack Casey Court, Fountain Inn, South Carolina 29644,
promises to pay to LOGIC PACKAGING, INC. ("Lender"), or order, at 27 Cedar Rock Drive,
Greer, South Carolina 29650, the sum of Three Hundred Fifty Thousand and No/100
($350,000.00) Dollars on the terms provided herein.

(2)    <u>Default Rate</u>. In addition to all other rights contained in this Note, if a Default (as defined
herein) occurs and as long as a Default continues, all Obligations shall bear interest at the rate of
four (4%) percent ("Default Rate"). The Default Rate shall also apply from acceleration until the
Obligations or any judgment thereon is paid in full.

(3)    <u>Repayment Terms</u>. This Note shall be payable in two (2) equal and consecutive annual
installments of One Hundred Seventy Five Thousand and No/100 Dollars ($175,000.00) on
August 31, 2013 and August 31, 2014. All principal and interest shall be due and payable on
August 31, 2014. All payments shall be applied first to accrued interest and then against
principal. All interest not paid when due shall bear interest at the same rate as the principal.

(4)    <u>Late Charge</u>. If any payments are not made when due, Borrower shall also pay to Lender
a late charge equal to five (5%) percent of each late payment. Acceptance by Lender of any late
payment without an accompanying late charge shall not be deemed a waiver of Lender's right to
collect such late charge or to collect a late charge for any subsequent late payment received.

(5)    <u>Attorneys' Fees and Other Collection Costs</u>. Borrower shall pay all of Lender's
reasonable expenses incurred to enforce or collect any of the Obligations, including, without
limitation, reasonable arbitration, paralegals', attorneys' and experts' fees and expenses, whether
incurred without the commencement of a suit, in any trial, arbitration, or administrative
proceeding, or in any appellate or bankruptcy proceeding.

(6)    <u>Defaults</u>. Each of the following shall constitute a default of this Note ("Default"):

        (a) (i) Failure to make any payment due under this Note when due; or (ii) breach or
            default in the performance of any of the covenants or agreements of Borrower
            contained herein or in the Loan Documents ("Performance Default") if such
            Performance Default shall continue for five (5) days or more after written notice to
            Borrower from Lender. Notwithstanding the above, if Lender has given written notice
            of a Performance Default to Borrower at least twice hereunder, then Lender shall not
            be required to give Borrower notice of any subsequent Performance Default again
            before pursuing all remedies available to Lender.

1

(b) The dissolution of, termination of existence of, appointment of a receiver for, assignment for the benefit of creditors of, or commencement of any bankruptcy or insolvency proceeding by or against Borrower or any of its Affiliates, and in the case of any such involuntary proceeding, same shall not have been dismissed within ninety (90) days after commencement thereof.

(c) A warranty or representation made or deemed made in the Loan Documents or furnished Lender in connection with the loan evidenced by this Note proves materially false, or if of a continuing nature, becomes materially false.

(d) Any default or event of default occurs under any other Loan Document.

(e) One or more judgments for the payment of money is rendered against Borrower in excess of fifty thousand and No/100 ($50,000.00) Dollars (singly or in the aggregate) and any such judgment shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against Borrower or any of its assets.

(f) Any event or circumstance shall occur or exist which has had, or which could reasonably be expected to have, a Material Adverse Effect.

(7)    Definitions.  For purposes of this Note, the following terms shall have the respective meanings given to them below:

(a) The term "Affiliate" shall mean any person, corporation, limited liability company, partnership or other entity which, directly or indirectly controls or is controlled by or is under common control with such corporation, limited liability company, partnership or other entity.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person.

(b) The term "Loan Documents", shall mean all documents executed in connection with or related to the loan evidenced by this Note and may include, without limitation, a term sheet, asset purchase agreement, deed of trust, security agreement, escrow agreement, security instruments, financing statements, and any renewals or modifications of the foregoing.

(c) The term "Obligations", shall mean any and all indebtedness and other obligations under this Note and all other obligations under any other Loan Documents.

(d) The Term "Material Adverse Effect" shall mean any of the following: (i) a material adverse effect on the business, operations, results of operations, prospects, assets, liabilities or financial condition of Borrower; (ii) a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents; or (iii) a material adverse effect on the ability of Lender to enforce the Obligations or to realize the intended benefits of any Loan Document, including a material adverse effect on the validity or enforceability of any Loan Document or of any rights against the

2

Guarantor, or on the status, existence, perfection, priority or enforceability of any Lien securing payment or performance of the Obligations.

(e) All terms that are used but not otherwise defined in any of the Loan Documents shall have the definitions provided in the Uniform Commercial Code.

(8)    Remedies Upon Default. If a Default occurs under this Note or any Loan Documents, Lender may at any time thereafter, take the following actions:

(a) Lender may accelerate the maturity of this Note whereupon this Note and the accelerated Obligations shall be immediately due and payable; provided, however, if the Default is based upon a bankruptcy or insolvency proceeding commenced by or against Borrower, all Obligations shall automatically and immediately be due and payable.

(b) Lender may exercise any rights and remedies as provided under the Note and other Loan Documents, or as otherwise provided by law or equity.

(9)    Security Agreement. The payment of this Note shall be secured by a first priority lien on all assets sold by Lender to Borrower pursuant to that Asset Purchase Agreement by and between Lender, Borrower, Geordy William Douglas Davidson and Industrial Packaging Supplies, Inc. of Greenville of even date herewith, as more fully described in that Security Agreement between Borrower and Lender of even date herewith.

(10)    Prepayments. Borrower shall have the right to prepay all or any part of the principal of this Note at any time without penalty.

(11)    Assignment. This Note and the other Loan Documents shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and permitted assigns. Lender's interests in and rights under this Note and the other Loan Documents are freely assignable, in whole or in part, by Lender. Borrower shall not assign its rights and interest hereunder without the prior written consent of Lender, and any attempt by Borrower to assign without Lender's prior written consent is null and void. Any assignment shall not release Borrower from the Obligations.

(12)    Applicable Law; Conflict Between Documents. This Note and, unless otherwise provided in any other Loan Document, the other Loan Documents shall be governed by and construed under the laws of the State of South Carolina without regard to conflict of laws principles. If the terms of this Note should conflict with the terms of any Loan Document, the terms of this Note shall control.

(13)    Severability. If any provision of this Note or of the other Loan Documents shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note or other such document.

(14)    Notices. Any notices to Borrower shall be sufficiently given, if in writing and mailed or delivered to the Borrower's address shown above or such other address as provided hereunder,

and to Lender, if in writing and mailed or delivered to the Lender's address shown above or such other address as Lender may specify in writing from time to time. In the event that Borrower changes Borrower's address at any time prior to the date the Obligations are paid in full, Borrower agrees to promptly give Lender written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid.

(15)  No Implied Waiver. Lender shall not be deemed to have modified or waived any of its rights or remedies hereunder unless such modification or waiver is in writing and signed by Lender, and then only to the extent specifically set forth therein. A waiver in one event shall not be construed as continuing or as a waiver of or bar to such right or remedy in a subsequent event. After any acceleration of, or the entry of any judgment on, this Note, the acceptance by Lender of any payments by or on behalf of Borrower on account of the indebtedness evidenced by this Note shall not cure or be deemed to cure any Default or reinstate or be deemed to reinstate the terms of this Note absent an express written agreement duly executed by Lender and Borrower.

Borrower hereby waives presentment, demand, protest and notice of dishonor. This Note is made and executed under and in all respects is to be construed by the laws of the State of South Carolina.

LOGIC PACKAGING ACQUISITION, LLC, a
South Carolina limited liability company

By: _____(SEAL)
Name:  Derrick Murdock
Title:    Authorized Member

4

## EXHIBIT F

### SECURITY AGREEMENT

SECURITY AGREEMENT ("Agreement") made effective as of the 5th day of September, 2012, by and between LOGIC PACKAGING, INC. ("Secured Party") and LOGIC PACKAGING ACQUISTION, LLC ("Debtor").

WHEREAS, Debtor is obligated to Secured Party in the sum evidenced by a promissory note of even date herewith ("Note"), given pursuant to that Asset Purchase Agreement ("Purchase Agreement") among Debtor, Secured Party and Geordy William Douglas Davidson; and

WHEREAS, Secured Party and Debtor are desirous of securing repayment of the Note and certain other obligations of Debtor;

NOW, THEREFORE, for and in consideration of the indebtedness and to secure the prompt payment of the same when due:

(1)     Debtor does hereby grant, bargain, sell and convey unto Secured Party a security interest in and to all assets of Debtor acquired from Secured Party pursuant to the Purchase Agreement, and all rights to which Debtor now or hereafter becomes entitled by reason of its interest in any of the previously described assets.

(2)     In addition to the indebtedness evidenced by the Note, the security interest shall secure Debtor's performance of the Purchase Agreement and this Agreement, as well as reimbursement of Secured Party for all costs and expenses incurred in the collection of all amounts due Secured Party under this Agreement, the Note, and the Purchase Agreement (collectively the "Obligations").

(3)     Each of the following shall constitute an event of default under this Agreement and the Obligations:

(a)     Default in the payment of any installment of principal or interest on the Obligations as and when the same shall become due and payable.

(b)     Any default or event of default by Debtor under this Agreement, the Note, or the Loan Agreement.

(c)     Violation by Debtor of any non-monetary term, condition, covenant, representation, warranty or agreement set forth in the Obligations, and the continuance of such default unremedied for a period of five (5) business days after Secured Party shall have given Debtor written notice thereof, or any other grace period provided for in any of the other documents evidencing the Obligations.

1

(d)      An assignment by Debtor for the benefit of its creditors, or if Debtor shall be adjudicated bankrupt, or any proceedings shall be commenced by Debtor under any bankruptcy reorganization, arrangement, insolvency, or assignment for the benefit of creditors, under any law or statute of the federal or state government whether now or hereafter in effect; or any such proceedings shall be instituted against Debtor and an order approving the petition is entered and such proceedings shall remain undismissed for a period of sixty (60) days; or Debtor by any action shall indicate its approval of, consent to, or acquiescence in any such proceeding or in the appointment of a trustee in bankruptcy or receiver of Debtor or of all or substantially all of the assets of Debtor.

(4)      If an event of default shall occur, Secured Party may proceed to enforce payment of all amounts due it and may exercise any and all rights provided by the South Carolina Uniform Commercial Code, or other applicable law, as well as all other rights and remedies possessed by Secured Party, all of which shall be cumulative.

(5)      Secured Party, at Debtor's expense, is hereby authorized to take any actions for the purpose of better establishing, attaching, amending, protecting, maintaining and perfecting the security interest created herein. In furtherance of the above, Secured Party is authorized file a financing statement (Form UCC-1) and any renewals and amendments thereto in any jurisdiction that it deems appropriate.

(6)      The security interest granted Secured Party hereunder shall continue as long as any amount remains unpaid upon the Obligaitons, and shall terminate automatically upon satisfaction of the Obligations.

(7)      This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

(8)      This Agreement shall be governed by the laws of the State of South Carolina, regardless of any conflicts of law.

(9)      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

*Signature Page to Follow*

2

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be executed as of the date first above written.

LOGIC PACKAGING, INC.

By: _____

Geordy William Douglas Davidson
President

LOGIC PACKAGING ACQUISTION, LLC

By: _____

Derrick Murdock
Authorized Member

3

## EXHIBIT G

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT ("Guaranty") made as of the 5th day of September, 2012, by Jerry W. Murdock and Industrial Packaging Supplies, Inc. of Greenville (referred to herein collectively as the "Guarantors" and individually as a "Guarantor") in favor of Logic Packaging, Inc. ("Seller").

WHEREAS, pursuant to that certain Asset Purchase Agreement ("Purchase Agreement") of even date herewith, Seller has sold substantially all of its assets to Logic Packaging Acquisition, LLC, a South Carolina limited liability company ("Purchaser");

WHEREAS, pursuant to Section 3.2(b) of the Purchase Agreement, Purchaser paid a portion of the purchase price by delivering a promissory note to Seller in the original principal amount of Three Hundred Fifty Thousand Dollars ($350,000.00) ("Note"), and granted to Seller a security interest in certain assets of Purchaser ("Security Agreement"); and

WHEREAS, Guarantors have agreed to guarantee Purchaser's performance of the Purchase Agreement, the Note and the Security Agreement; and

WHEREAS, the making of the loan to Purchaser by Seller (the "Loan") as evidenced by the Note will confer a substantial benefit upon Guarantors; and

WHEREAS, Seller would not have entered into the Purchase Agreement, the Security Agreement and accepted the Note as payment under the Purchase Agreement without Guarantors' agreement to execute this Guaranty.

NOW, THEREFORE, in consideration of the Loan, the Security Agreement and the Purchase Agreement, which Guarantors acknowledges will substantially benefit Guarantors, and the sum of Ten and No/100 ($10.00) Dollars, the receipt and sufficiency of which as consideration are hereby acknowledged, Guarantors hereby agree and covenant as follows:

(1)    Guarantors, jointly and severally, hereby unconditionally guarantee the payment, performance and discharge of all of Purchasers's obligations under the Purchase Agreement, the Note and the Security Agreement, and all expenses (including reasonable attorney's fees) incurred in the collection thereof, (collectively the "Obligations"), and waive presentment, demand, notice of dishonor, protest and all other notices whatsoever. Guarantors agree that the parties entitled to performance of the Obligations may from time to time extend or renew said Obligations for any period (whether or not longer than the original period of said Obligations) and may grant any releases, compromises or indulgences with respect to said Obligations or any extension or renewal thereof or any security therefor or to any party liable thereunder or hereunder (including but not limited to failure or refusal to exercise one or more of the rights or remedies provided by said Obligations), all without notice to or consent of Guarantors and without affecting the liability of Guarantors hereunder, who may be sued by Seller with or

without joining any other party who has guaranteed the Obligations and without first or contemporaneously suing such other persons, or otherwise seeking or proceeding to collect from them or from the primary obligor of the Obligations.

(2)    Guarantors understand and agree that Guarantors' liability hereunder shall be primary and immediate, and shall not be contingent upon the exercise or enforcement by Seller of whatever remedies it may have against Purchaser or others, or the enforcement of any lien or realization upon any security Seller may at any time possess.

(3)    The liability and obligations of the Guarantors hereunder Agreement shall in no event exceed Three Hundred Fifty Thousand Dollars in the aggregate, plus interest accruing after any default, attorneys' fees, court costs, and other reasonable amounts incurred in the collection of the amounts guaranteed hereunder, and shall terminate immediately upon Purchaser's satisfaction of its obligations under the Note.

(4)    Industrial Packaging Supplies, Inc. of Greenville ("IPS") hereby represents and warrants to Seller that the internally prepared unaudited balance sheet dated July 31, 2012, which is attached hereto as Exhibit A, has been prepared in accordance with the books and records of IPS and constitutes a fair and accurate portrayal of the financial condition of IPS, as of the dates or periods covered thereby.

(5)    This Guaranty shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, legal representatives, successors, and assigns.

(6)    In the event that any provision hereof is deemed to be invalid by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Guaranty shall be construed as not containing such provisions, and the invalidity of such provisions shall not affect other provisions hereof which are otherwise lawful and valid and shall remain in full force and effect.

(7)    This Guaranty constitutes the entire agreement and supersedes all prior agreements and understandings both oral and written, between the parties with respect to the subject matter hereof. This Agreement may be executed in counterparts, which together shall constitute one instrument. It shall not be necessary for all parties to sign the same counterpart.

(8)    **THE VALIDITY, INTERPRETATION, ENFORCEMENT, AND EFFECT OF THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF SOUTH CAROLINA, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.**

*Execution Page to Follow*

IN WITNESS WHEREOF, Guarantors, on the day and year first above written, have executed this Guaranty Agreement.

Industrial Packaging Supplies, Inc. of Greenville,
a South Carolina Corporation

By: _____(SEAL)
Name: Jerry W. Murdock
Title:   President

_____

Jerry W. Murdock

## EXHIBIT A